IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Colleton Preparatory Academy, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | C/A No. 2:04-531-18 |
| | ) | |
| vs. | ) | |
| | ) | **ORDER and OPINION** |
| Hoover Universal, Inc, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This action is before the court following a default damages hearing on January 31, 2005 and February 1, 2005. Based upon the evidence presented and the applicable law as set forth below, the court makes the following findings of fact and conclusions of law.

**I.    PROCEDURAL HISTORY**

On March 24, 2003 plaintiff Colleton Preparatory Academy, Inc. initiated this action against Beazer-East, Inc. and Hoover Treated Wood, Inc., alleging causes of action for negligence, recklessness, and/or gross negligence and violation of the South Carolina Unfair Trade Practices Act. Both causes of action arise out of damage to plaintiff's roof trusses. Hoover Wood was served on April 1, 2003 but did not respond, resulting in an entry of default on May 15, 2003.

On June 6, 2003, plaintiff filed an Amended Summons and Complaint substituting defendant Hoover Universal, Inc. for Hoover Wood. Defendant failed to answer, and this court filed an Order of Default on August 8, 2003. Thereafter, defendant filed a Motion to Quash Service of Process and to Set Aside the Entry of Default. By Order dated December 1, 2003, this court denied defendant's motions and ordered a

damages hearing to be held within sixty days.

Before the sixty days expired, one of plaintiff's attorneys was forced to withdraw due to the existence of a conflict of interest between the attorney and defendant. The parties entered into a Consent Order bifurcating the claims against defendant from the claims against Beazer-East. As a result of this bifurcation, and pursuant to the instruction of the Clerk of Court, plaintiff's counsel refiled its Complaint, but naming only defendant. On April 2, 2004, defendant's counsel filed an Answer to the Complaint and Rule 26.01 Interrogatories. Plaintiff moved to strike defendant's Answer. The court granted plaintiff's motion to strike by Order entered June 30, 2004 and held that any judgment in the case would be awarded on the Complaint under which defendant was held in default.

On November 17, 2004, defendant moved for a jury trial. The court denied the request by written Order dated December 20, 2004, finding that there was no right to a jury trial on damages following default.

On January 31, 2005 and February 1, 2005, the court conducted a hearing on damages. Prior to the damages hearing, defendant filed eight motions in limine. At the hearing, defendant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 52, arguing that recovery under the negligence count is barred by the economic loss doctrine and that recovery under SCUTPA is barred because plaintiff did not have commercial dealings with the product's seller. The Rule 52 motion is addressed below. The motions in limine which have not been withdrawn or rendered moot are addressed in the damages discussion.

## II.     FINDINGS OF FACT

1.     Plaintiff is a small private school in Walterboro, South Carolina, that consists of three buildings.  In the early 1970s a predecessor of Hoover Universal, Dixie Wood Preserving Company, manufactured fire retardant treated ("FRT") plywood and structural lumber under the brand name Firex.  In 1972 plaintiff completed construction of its High School/Administration Building, using Firex structural lumber and plywood in the building's roof truss system.  Plaintiff had previously constructed two other school buildings in approximately 1967 and 1968.  These buildings, referred to as the "Lower School" and "Middle School," were also built with FRT roof truss systems, but used Non Com brand FRT wood manufactured by Koppers Company, Inc., a competitor of Dixie. This action concerns the Firex trusses in the Administration building.

2.     Defendant, by its default, admits the factual allegations stated in the amended complaint of June 6, 2003. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 781 (4th Cir. 2001).  The pertinent allegations from the default complaint are reproduced below, in their original paragraph designation:

12.     Sometime just prior to January of 2002, employees of the plaintiff contacted engineers to investigate and inspect their buildings to determine the structural integrity of the roof structures, after determining that their buildings may have contained fire retardant treated lumber.

13.     Subsequent investigations of the roof framing system of all three buildings revealed the failure of numerous chord and web members of the roof trusses, severe corrosion of the metal truss connection plates, and the delaminating and deterioration of roof sheathing, and loss of strength of structural wood members.

14.     Subsequent inspections of the roof framing system and sheathing has revealed that the damage to the roof framing systems and sheathing i[s] progressive and [is] steadily becoming worse.

15.     Plaintiff's investigation has indicated that the degradation and deterioration of the roof framing system and sheathing and the corrosion

3

of the metal truss connection plates is due to the long term exposure to the harmful effects of the Non Com and Firex fire retardant treatment formulated by Koppers and Dixie Wood Preserving Company.

16. The long-term exposure to the harmful effects of the Non Com and Firex fire retardant treatments has reached the point where the majority of the roof trusses and the sheathing have failed or are about to fail and therefore the structural integrity of the roof framing and sheathing on all three buildings has been substantially impaired.

17. Because of the extremely hazardous and unsafe conditions created by the defendants (and their predecessors in interest), [plaintiff] has had to perform extensive temporary repairs and will have to completely replace the roofing and roof framing system on all three buildings at a cost estimated to approach two million dollars.

18. The aforesaid damages are the proximate result of the acts and/or omissions of the defendants and their predecessors in interest.

19. The amount in controversy exceeds 75,000 and the parties are diverse; therefore, jurisdiction in this Court is appropriate.

**COUNT I**
**RECKLESSNESS, NEGLIGENCE AND/OR GROSS**
**NEGLIGENCE OF THE DEFENDANTS BEAZER**
**AND HOOVER**

20. Plaintiff realleges and incorporates by reference Paragraphs 1 through 18 of the common allegations of this complaint as though more fully set forth herein.

21. At all times relevant hereto, Koppers, Dixie Wood Preserving Company and defendants Beazer and Hoover, were under a duty to use due care and caution for the safety of foreseeable users and consumers of its products, Non Com and Firex, including the plaintiff, in formulating, marketing, distribution, licensing and selling the product; were under a further duty to observe and comply with the requirements of all applicable statutes, regulations and ordinances; and to insure that the product met or exceeded industry standards.

22. In violation of said duties, Koppers, Dixie and the Defendants, were guilty of recklessness, negligence and/or gross negligence in the following manner:

   a. Formulating, testing, marketing distribution, licensing and sale of its fire retardant treatments, Non Com and Firex, which were defective and unreasonably dangerous for their foreseeable use because of their propensity to cause structural lumber to lose strength and elasticity and become less resistant to impact loads, to further cause plywood decking to delaminate and deteriorate, and to cause metal truss connections plates to corrode;

4

b.    Formulation, testing, marketing distribution, licensing and sale of its fire retardant products, which were defective and unreasonably dangerous for their foreseeable use because of their hygroscopic nature, which increases the tendency of wooden structural members and sheathing to undergo acid hydrolysis and to cause corrosion of metal truss connection plates;

c.    Failure to properly test the respective formations to properly evaluate their effect on structural lumber, sheathing and metal truss connection plates under foreseeable conditions for extended periods of time;

d.    Advertising and marketing their Non Com and Firex fire retardant treatments to building code officials, architects, builders, truss manufacturers and end users, when they knew or should have known that the products were defective and unsuitable for use under foreseeable conditions in roofing systems in South Carolina.

e.    Failure to provide proper and adequate specifications in connection with the advertising, marketing, distribution, licensing and sale of their products setting forth the necessary and appropriate conditions under which the Non Com and Firex fire retardant treatments could be safely utilized.

f.    Failure to provide proper and adequate specifications in connection with the advertising, marketing, distribution, licensing and sale of their products setting forth the necessary and appropriate conditions under which the Non Com and Firex fire retardant treatments could be safely utilized;

g.    Failing to develop, market and sell alternative fire retardant formulations which were both commercially available and technologically feasible, and which they knew did not posses extremely hazardous or defective qualities of its Non Com and Firex fire retardant treatments.

h.    Failing to provide proper and adequate updates, information and warnings to customers, after the sale of the products, of the hazards associated with the use of the said products under foreseeable conditions in roofing systems in South Carolina, as that information became known or available.

23.    As the direct and proximate result of the acts and/or omissions of Koppers,

5

Dixie and defendants, plaintiff suffered actual and punitive damages as set forth below.

**COUNT II**
**UNFAIR TRADE PRACTICES**

24.    Plaintiff realleges and incorporates by reference paragraphs 1 through 23 of the common allegations of this complaint as though more fully set forth below.

25.    That the actions of the defendants and their predecessors in interest in advertising, offering for sale, selling and distributing the aforesaid productions (Non-Com and Firex) when they knew that said products were unsuitable for the advertised use by the consuming public, constituted unfair and deceptive trade practices proscribed by S.C. Code Ann. Section 39-5-10 et seq.

26.    That the actions of the defendants (and their predecessors in interest) were unfair, capable of repetition, and were injurious to the public.

27.    That as a result of the actions of the defendants (and their predecessors in interest), this plaintiff has been damaged and is entitled to treble damages, costs and attorneys fees.

(Pl.'s amended compl., ¶¶ 12 - 27.)

**III.    CONCLUSIONS OF LAW**

**a.    Default Judgment**

Initially the court must determine what effect, if any, defendant's default status has on its motion for judgment under Fed. R. Civ. P. 52.  Through its default, defendant admits plaintiff's well-pleaded allegations of fact, but is not held to admit conclusions of law. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 781 (4th Cir. 2001) (quoting Nishimatsu Constr. Co., v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)). A default is not an "absolute confession by the defendant of his liability and of the plaintiff's right to recover;" rather, the court must determine whether the allegations in the complaint support the relief sought.  Ryan, 253 F.3d at 781; see also 10A Wright & Miller, Federal Practice & Procedure § 2688 (3d ed. 1998) ("Even after default, it remains for the court to consider whether the unchallenged facts continue a legitimate

6

cause of action, since a party in default does not admit mere conclusions of law."). Defendant presents legal issues which dispute liability, notwithstanding the factual allegations.[1]  Therefore, the court may consider defendant's motion despite that party's default status.

      **b.**      **Negligence Claim**

      Defendant contends the economic loss rule bars plaintiff's negligence claim. This doctrine exists at the intersection of contract and tort law.  As the South Carolina Supreme Court notes,

> This rule . . . assist[s] in determining whether contract or tort theories
> are applicable to a given case.  Where a purchaser's expectations in a
> sale are frustrated because the product he bought is not working
> properly, his remedy is said to be in contract alone, for he has suffered
> only "economic" losses.  Conversely, where a purchaser buys a product
> which is defective and physically harms him, his remedy is in either
> tort or contract.  This is so . . . because his losses are more than merely
> "economic."

Kennedy v. Columbia Lumber and Mfg. Co., 299 S.C. 335, 345, 384 S.E.2d 730, 736 (1989). This rule prevents tort law from overwhelming and ultimately enveloping contract law.  Tort law imposes societal duties, while contract law allows the parties to negotiate the allocation of risk.  If pure economic loss was actionable under tort, then the means of assigning risk through prior agreement would be meaningless. 2000 Watermark Ass'n v. Celotex Corp., 784 F.2d 1183, 1186 (4th Cir. 1986).  "It would be virtually impossible for a seller to sell a product 'as is' because if the product did not meet the

---

[1] Plaintiff also contends the economic loss rule is an affirmative defense that was waived by defendant's default.  As discussed below, the economic loss rule is based on fundamental policy decisions, and is not waived by a party's failure to plead it.

economic expectations of the buyer, the buyer would have an action under tort law." Id.

Defendant contends that the economic loss rule applies, and therefore plaintiff's remedy is in contract, thus prohibiting the negligence cause of action. The doctrine is implicated because plaintiff's structural engineering and roof structures expert (Alan Campbell) admitted that the only item or material in the building that has deteriorated or been damaged is the FRT wood. (Tr. at 202.) Plaintiff contends that the economic loss rule does not apply because at least one exception to the rule permits a recovery in tort.

### i.    Threat of Bodily Injury

Plaintiff claims the economic loss rule does not apply because the product created a "substantial risk of personal injury, even though the injury has yet occurred." (Pl.'s Return to Def.'s Mot. for J. at 1.) Plaintiff's structural engineering and roof structures expert noted that due to loss of wood strength, the effected structures

> represent a life safety concern. . . . The deteriorated conditions are such that the trusses are no longer able to withstand code-prescribed loads. For this reason, extensive truss failures (which may include partial or full collapse, possible human injury or death) will eventually occur if the buildings are not fully repaired.

Pl.'s Ex. 7, at 5-6 (Campbell Report). Plaintiff contends South Carolina recognizes an exception to the economic loss rule for products that pose a threat of bodily injury. Defendant argues that exception applies only to asbestos cases. No South Carolina or federal court opinion in this jurisdiction addresses the "threat" exception in the non-asbestos context. The interplay of recent state and federal cases, as well as guidance from other jurisdictions, demonstrates that defendant's argument is the correct one.

Plaintiff's contention is based on a 1986 federal district court case in which Judge

8

G. Ross Anderson Jr. considered an asbestos manufacturer's attempt, based on the economic loss rule, to overturn an adverse jury verdict. City of Greenville v. W.R. Grace, 640 F. Supp. 559, 564 (D.S.C. 1986).  Greenville sought to recover the cost of removing and replacing a fireproofing product containing asbestos that defendant installed over a decade earlier.  The court noted that even though the city suffered an economic loss, the "asbestos-containing materials have contaminated the building, damaging property and posing a continual hazard to building occupants and workmen." Id.  The jury verdict stood, on the rationale that the asbestos damaged other property and posed a health threat.

In affirming the district court's conclusion, the Fourth Circuit focused on the "health threat" exception. City of Greenville v. W.R. Grace & Co., 827 F.2d 975 (4th Cir. 1987). The court believed South Carolina courts

> would be willing to extend tort liability to the manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment, thereby causing damage to the property owner who has installed the harmful product in his building. Greenville cannot be precluded from asserting a claim for negligence on the part of [defendant] simply because none of the occupants . . . has yet developed an asbestos-related disease.

Id. at 978.  Plaintiff seeks to extend this rationale to FRT lumber cases.

Subsequent to both the district court and Fourth Circuit rulings in Grace, the state supreme court stated the exceptions to the doctrine in the generic, non-asbestos context. Kennedy, 299 S.C. 335, 384 S.E.2d 730.  Summarizing the doctrine, the court noted

> [t]he "economic loss rule" simply states that there is no tort liability for a product defect if the damage suffered by the plaintiff is only to the product itself.  In other words, tort liability only lies where the damage done is to other property or is personal injury.

Id. at 341, 384 S.E.2d at 734 (emphasis added).  The court did not list threat of personal

injury as grounds to escape the rule's limitations.  If the court wished to extend <u>Grace</u> to non-asbestos cases, it could have included "threat of personal injury" as an additional instance in which tort liability lies.

Post-<u>Grace</u> and <u>Kennedy</u>, the state supreme court has declined to recognize the "threat" exception, even in asbestos cases. In <u>Kershaw County Board of Education v. U.S. Gypsum Co.</u>, 302 S.C. 390, 396 S.E.2d 369 (1990), the court upheld a plaintiff's action against an asbestos manufacturer for the cost of removing the material from several school buildings.  Rather than discuss any threat to personal health, the "sole issue . . . to be addressed [was] whether the economic loss rule applies when a plaintiff claims and proves other property damage." <u>Kershaw</u>, 302 S.C. at 392, 369 S.E.2d at 393. The court cited the district court decision in <u>Grace</u> for the proposition that the doctrine does not preclude a tort action when the defective product "causes damage to other property of the plaintiff." <u>Id</u>.  The court cited <u>Kennedy</u> for the same holding.  The supreme court never addressed the putative "threat" exception.  For the second time, the South Carolina Supreme Court declined to cite threat to health as justification to prevent application of the economic loss rule.

At least one state court has dismissed a negligence claim for FRT wood deterioration because of the economic loss rule.  <u>Laurens County School Dist. #5 v. Hoover Universal, Inc.</u>, C/A No. 91-CP-30-577 (S.C. 8th Jud. Cir., March 30, 1992). Citing <u>Kershaw</u>, the court noted

> while the economic loss rule may not apply if a defective product
> causes personal injuries or damages to other property belonging to
> plaintiff, the allegedly defective FRT wood now at issue is not
> claimed to have caused any personal injury, nor is it alleged to have

10

damaged other property of [plaintiff's].

Id. at 4.  As in Kennedy and Kershaw, the court did not recognize a "threat" exception.

Moreover, the Laurens County holding is instructive for the case at bar because of the

similarity of facts. See infra, p. 14.

South Carolina courts have repeatedly declined to preclude application of the

economic loss rule based on a threat to bodily injury in the non-asbestos context.[2]

Therefore, plaintiff's argument for this exception is unavailing.

### ii.    Other Property exception

Plaintiff contends that the economic loss rule should not apply because "the

shingles, insulation, suspended ceiling, lighting fixtures, electrical, and heating and air-

conditioning property . . . are damaged by the necessity of having to remove the roof."

(Pl.'s Return to Def.'s Mot. for J. at 12.)  The state circuit court in Laurens County

rejected a similar contention, finding "[d]amage to components of [plaintiff's] roof

system being repaired or replaced is not 'damage to other property.'" Laurens County,

No. 91-CP-30-577 at 4. The Fourth Circuit also rejected a similar argument in 2000

Watermark Ass'n, Inc. v. Celotex Corp., 784 F.2d 1183, 1188 (4th Cir. 1986), in which

plaintiff alleged removal of defective shingles caused damage to the underlying felt and

tar paper.  The court labeled the cost of replacing the felt an "incidental expense which

---

[2] Other jurisdictions have declined to recognize a "threat of bodily injury" exception to the economic loss rule in FRT cases.  See Pulte Home Corp. v. Osmose Wood Preserving, Inc., 60 F.3d 734, 741 (11th Cir. 1995) (noting two exceptions - personal injury or damage to other property); Mt. Lebanon Personal Care Home v. Hoover Universal, Inc., 276 F.3d 845, 853 (6th Cir. 2002) (rejecting "serious risk of injury exception to the economic loss rule").

may be recoverable in a warranty action, but it will not support an action for negligence." 2000 Watermark, 784 F.2d at 1188. The Eleventh Circuit has rejected the "other property" exception in the FRT context: "Although [plaintiff] did replace roof components other than the FRT plywood, these components were not replaced because they were damaged. Rather, replacing the shingles and other materials was merely a consequence of replacing the damaged FRT plywood." Pulte Home Corp. v. Osmose Wood Preserving, Inc., 60 F.3d 734, 741 (11th Cir. 1995).

Plaintiff's alleged other property damage is more accurately characterized as incidental expenses related to the wood truss system replacement. The shingles, insulation, suspended ceiling, lighting fixtures and electrical/AC/heating components have not been damaged by the FRT wood, but will be effected during its removal and replacement. The defective wood has not caused damage to the other components of the roof, and therefore the "other property" exception does not apply.

### iii.     Special Relationship/Legal Duty exception

Plaintiff contends the parties are in "identical positions" as the litigants in Griffin Plumbing and Heating Co. v. Jordan, Jones & Goulding, Inc., 320 S.C. 49, 463 S.E.2d 85 (1995), and as such, that case's holding should apply. In Griffin, a contractor brought a professional malpractice action against the engineer supervising the construction project. The court noted that negligence actions typically cannot lie between parties in privity of contract; however, when there is a "special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action." Griffin, 320 S.C. at 55, 463 S.E.2d at 88. Plaintiff contends that defendant

12

breached the duty of due care by not ensuring its product met industry standards, and that

breach can support a tort action. The "special relationship" discussed in <u>Griffin</u> includes

lawyer-client, accountant-client, and engineer-contractor, see <u>id</u>., but not vendor-vendee,

<u>see</u> <u>Palmetto Linen Services, Inc. v. U.N.X., Inc</u>., 205 F.3d 126, 129 (4th Cir. 2000), or

buyer-seller, <u>see</u> <u>Laidlaw Environmental Services., Inc. v. Honeywell, Inc.,</u> 966 F. Supp.

1401, 1415 (D.S.C. 1996). The parties at bar were not in a "special relationship" to

permit a tort action.

Plaintiff also quotes language from <u>Kennedy</u> to suggest that a breach of a legal

duty can support a tort action. <u>Kennedy</u> addressed a home builder's tort liability to a

homeowner, and held that a

> builder may be liable to a home buyer in tort despite the fact that the
> buyer suffered only "economic losses" where: (1) the builder has violated
> an applicable building code; (2) the builder has deviated from industry
> standards; or (3) the builder has constructed housing that he knows or
> should know will pose serious risks of physical harm.

<u>Kennedy</u>, 299 S.C. at 347, 384 S.E.2d at 738. <u>Kennedy</u> was premised on the notion that

public policy imposes a "legal duty on a builder to refrain from constructing housing that

he knows or should know will pose serious risks of physical harm." <u>Id</u>. This policy stems

in part from the state's desire to protect the new home buyer. <u>Id</u>. Defendant is not a

builder, and plaintiff is not a home buyer; therefore, neither the <u>Kennedy</u> paradigm nor

rationale fits. Further, expanding the "home builder exception" beyond the home

building context has far-reaching policy ramifications. Such a holding would undermine

the limitations on tort actions imposed by the South Carolina Supreme Court in <u>Griffin</u>

and <u>Kennedy</u>, and would not be supported by the public policy issues defined in

Kennedy.

As noted above, the state court's holding in Laurens County is instructive.  Both cases involve the same defendant.  As in the present case, defendant manufactured FRT wood used in plaintiff's roof truss system.  Both plaintiffs allege that the FRT product is defective and prematurely deteriorated, necessitating its removal and replacement.  In both cases there was no evidence of injury to other property nor bodily physical injury.  The Laurens County court found the Kennedy exception inapplicable because the parties were not a homeowner and residential builder.  The state court's reasoning is consistent with this court's understanding of the economic loss rule in South Carolina.  As no exception to the economic loss rules applies to plaintiff's claim, the court finds that doctrine bars plaintiff's negligence action.  The court declines plaintiff's invitation to certify the question to the South Carolina Supreme Court.

### c.     South Carolina Unfair Trade Practices Act

#### i.     Privity Requirement

Defendant contends that plaintiff cannot maintain a SCUTPA claim because plaintiff did not deal with defendant or defendant's predecessor when purchasing the FRT lumber.  Defendant premises its argument on the South Carolina Supreme Court's answer to the following question certified by this court:

> Under South Carolina law, can Plaintiffs in a residential construction defects case sue Defendant builder, seller and developer under the South Carolina Unfair Trade Practices Act if Plaintiffs did not purchase their residences from Defendant but from the original homeowner more than three years after the initial sale?

Reynolds v. Ryland Group, Inc., 340 S.C. 331, 333, 531 S.E.2d 917, 919 (2000).  In a

brief opinion, the court held that the action could not be maintained despite the absence of a "specific provision within SCUTPA which limits a cause of action to an immediate purchaser." Id. The court cited the Texas Supreme Court's analysis of that state's unfair trade practices law, which required a plaintiff to have engaged in a consumer transaction with the defendant. Id. Defendant interprets Reynolds to limit all SCUTPA actions to purchasers "who actually had dealings with the defendant." (Def.'s Mot. for J. at 5.) Such a reading would require privity between the parties in order to make a SCUTPA claim. Elements of Reynolds support defendant's interpretation. The court's conclusion was not explicitly limited to the builder/buyer context, and Justice Burnett's dissent interpreted the majority as imposing a privity requirement on all SCUTPA claims. Reynolds, 340 S.C. at 339, 531 S.E.2d at 921.

Nevertheless, the profound consequences of defendant's interpretation is inconsistent with the subsequent history of Reynolds. In the five years since the case was handed down, no reported opinion - state or federal - has cited Reynolds. Neither the South Carolina Law Review nor S.C. Lawyer has mentioned the case. The 2003 edition of Elements of Civil Causes of Action, published by the South Carolina Bar, omits discussion of Reynolds in its seven page analysis of SCUTPA. The dearth of discussion of Reynolds undermines defendant's contention that it imposes a significant new requirement for SCUTPA claims. Rather, the lack of analysis suggests that Reynolds is limited to the builder/buyer context.

Furthermore, imposing a privity requirement for SCUTPA claims would seemingly prohibit competitor suits under the act. Yet eleven months prior to Reynolds,

15

the supreme court declined to grant certiorari to a court of appeals decision upholding a manufacturer's use of SCUTPA against a competitor. See Global Protection v. Halbersberg, 332 S.C. 149, 503 S.E.2d 483 (Ct. App. 1998), cert. denied, April 22, 1999. Defendant's reading of Reynolds would preclude entities not in privity, such as competitors, from SCUTPA remedies.

For these reasons, the courts finds that the holding in Reynolds does not preclude plaintiff from maintaining a SCUTPA claim.

### ii.     Liability

Plaintiff must demonstrate three elements to recover under SCUTPA: a violation of the Act, proximate cause, and damages. Charleston Lumber Co. v. Miller Housing Corp., 318 S.C. 471, 480 (Ct. App. 1995); rev'd on other grounds, 338 S.C. 171 (2000). Violations of the Act include unfair or deceptive trade practices. Id.  The factual allegations of plaintiff's complaint satisfy these requirements.

## IV.     DAMAGES

Plaintiff's revised January 25, 2005 cost estimate lists damages at $969,572.38.[3] (Pl.'s Ex. 10-B.)  Defendant challenges this estimate on a number of fronts.

---

[3] Several revisions to the January 28, 2005 cost estimate were made a trial.  Line item 9.03 (electrical hookup of portable classrooms) was reduced from $25,000.00 to $17,650.00 (Tr. at 250), and $19,607.00 was added for removing the phone, voice and intercom systems and installing them into the temporary classrooms. (Tr. at 251-52.) These corrections resulted in a new subtotal of $735,026.78. The percentage costs (contingency allowances, bonding and licenses, design fees and construction administration, overhead and profit) were then recalculated with the new subtotal for a total of $985,964.92. Although the percentage costs add up to 32.75%, they actually represent a 34.14% markup on the subtotal.  The bonding and licenses, design fees and construction administration, overhead and profit fees are calculated after the five percent contingency allowance is added to the subtotal. (See Pl.'s Ex. 10-B; Moore Decl. ¶ n.4.)

### a.    Temporary classrooms and associated expenses

Defendant seeks to limit plaintiff's damages to the amount and kind purportedly demanded in the complaint upon which default was entered.  See Fed. R. Civ. P. 54(c) ("a judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment.").  The default complaint requested an estimated $2 million in damages for roof replacement and temporary repairs.  When the case was bifurcated following default, plaintiff refiled a complaint to generate a new case number.  The new complaint stated $627,655.20 for the same two reasons, with an additional request for expenses related to temporary classrooms and offices to be used during the repairs.

Prior to trial, defendants filed a motion to strike the new language added to the new complaint.  In a June 30, 2004 Order the court found the new language did not amend the default complaint and denied defendant's motion to strike the language.  However, the court ordered that any judgment in this case was to be awarded based on the default complaint.  Therefore, damages are capped at $2 million,[4] and are limited to roofing replacement and temporary repairs.[5]

Defendant contends the expenses for temporary classrooms and office space, and costs related to those temporary spaces, are a different kind of damage than those

---

[4] The $2 million amount stated in the default complaint estimates damages for all three buildings on plaintiff's campus.

[5] Defendant contends damages should be capped at $627,555.00.  That amount was specified in the interrogatories and the new complaint as the cost of replacement and temporary repairs.  However, that amount was not mentioned in the default complaint, and therefore does not operate as a cap.

specified in the default complaint.  The Fourth Circuit has interpreted Fed. R. Civ. P. 54(c) to require the "relief available on default be . . . 'within the fair scope of the allegations of the complaint.'" Compton v. Alton S.S. Co., 608 F.2d 96, 105 (4th Cir. 1979).  The court finds the costs related to temporary classrooms and office space to be "within the fair scope" of the requested repair and replacement damages.  These costs are consequential expenses incurred during the replacement of the defective roof truss system.  As noted below, it is reasonable and foreseeable that repairs might have to be made during the school's academic year.  Plaintiff may recover these costs.

**b.     Mitigation of Damages**

Defendant contends plaintiff failed to mitigate damages, and therefore cannot recover the expense of temporary classrooms and the increased costs of materials.

**i.     Temporary Facilities**

Plaintiff's revised cost estimate includes the cost for temporary classrooms and office space, and related expenses, amounting to $141,329.90 (Pl.'s Ex. 10-B, line items 9.01 - 9.03, reduced by trial revisions.)  Defendant maintains that a failure to undertake the repairs during the summer (which would obviate the need for the temporary space) is an unreasonable failure to mitigate damages.  At trial, plaintiff's contractor stated he could not perform the repairs during summer 2005, but they could be scheduled for the fall. (Tr. at 300.)  Generally, an injured party must do "those things a prudent person would do to avoid damages that are reasonably avoidable, [but is not required] to exert himself unreasonably or to incur substantial expense to avoid damages." Chastain v. Owens Carolina, 310 S.C. 417, 421 (1993).  Delaying repairs until summer 2006 is

18

unreasonable in light of the existing safety threat posed by the building's current condition. (See Pl.'s Amended Compl. ¶ 16; Pl.'s Ex. 7, at 5-6 (Campbell Report).)  The cost of temporary accommodations may be included to ensure the building is repaired as soon as possible.  If revised construction schedules designate summer 2006 as the earliest opportunity to repair the building, then these damages are not recoverable.[6]

### ii.     Increased Cost of Materials

In the three years since plaintiff discovered the problem with the truss system, material and labor costs have increased significantly.  Defendant contends plaintiff's decision not to replace the truss system when the problem was identified amounts to a failure to mitigate.  Therefore, defendant requests the court exclude the increase in material or labor costs from any award, and calculate damages based on the November 2002 cost estimate. (Pl.'s Ex. 10-A.)  Plaintiff bases damages on a January 2005 cost estimate, which includes the increased material costs.  As noted, a party need not exert himself unreasonably or incur substantial expense to avoid damages. Chastain, 310 S.C. at 421. Further, "the party who claims damages should have been minimized has the burden of proving they could reasonably have been avoided or reduced." Id.  Defendant suggests that plaintiff need only have undertaken the very repairs that it claims are

---

[6] If summer is the earliest date to replace the roof truss system, then plaintiff cannot recover the $141,329.90 cost for temporary classrooms and associated expenses. If the temporary classrooms are not included in the award, then $6,000 must be added for storage containers. (Tr. at 232-233.)  That amount was originally included in the November 2002 cost estimate, but was taken out when the temporary classrooms were included in the January 2005 estimate. Therefore, the January 2005 cost estimate would decrease by $135,329.90 if the temporary classrooms and associated expenses were not included.

necessary in order to mitigate its damages.  However, defendant has produced no

evidence indicating plaintiff had the financial resources to afford the repairs.  As such,

defendant does not meet its burden of demonstrating that the damages (cost of increased

materials) could reasonably have been avoided.  The increased costs of materials and

labor may be included in any award.

    The major differences between the November 2002 and January 2005 cost

estimate is the increased cost of materials and temporary classroom and office space.

(Tr. at 228; 224-25.)  As noted, both of these "new" costs may be included in the award.

Therefore, the court will use the January 25, 2005 cost estimate to calculate any award.

    **c.**      **Betterments**

    Defendant contends that plaintiff's cost estimate for a steel replacement system is

an unwarranted betterment, and requests the court to limit any recovery to the cost of a

new FRT roof.  Under South Carolina law, a plaintiff claiming cost of repair damages is

only permitted to recover the cost of restoring the property to an undamaged condition,

and is not permitted to recover for upgrades beyond such repairs.  See Sea Side Villas II

Horizontal Prop. Regime v. Single Source Roofing Corp., 64 Fed. App. 367 (4th Cir.

2003); Coleman v. Levkoff, 128 S.C. 487, 122 S.E.2d 875 (S.C. 1924). The South

Carolina Supreme Court set out the controlling rule in Coleman:

> If . . . the owner has the property repaired and restored to a condition in
> which its market value equals or exceeds the market value before the
> injury, the measure of damages in that case is the reasonable cost of
> restoring the property to its previous condition . . . .

128 S.C. at 487, 122 S.E.2d at 876.  These principles were recently applied by the Fourth

Circuit in Sea Side Villas, which held that a plaintiff seeking cost of repair damages for a

negligently installed roof could not recover for any upgrades included in the repairs:

> There is also evidence in the record suggesting that the new roof contained additional features that [plaintiff] rejected as too expensive when it contracted . . . in 1990. Of course, [plaintiff] is not entitled to be placed in a superior position by asking [defendant] to pay the cost of providing [plaintiff] with a more expensive and technologically superior roof. Rather, as noted above, [plaintiff] is entitled to damages equaling the reasonable cost to repair the roof.

64 Fed. App. at 374 n. 3. Plaintiff argues that the use of steel in this case is not an upgrade because steel would provide fire-resistant quality similar to its current FRT wood roof.

Although a steel roof system may share the fire resistant quality of plaintiff's current FRT wood system, the record in this case establishes steel has other desirable qualities that allow it to command a higher price. For example, steel has more resistance to moderate heat and humidity, a higher strength to weight ratio, and is easier to repair. (Moore Decl. ¶ 7.) These perceived advantages of steel make it marketable to justify the more than two-fold cost increase in material costs associated with using steel trusses and sheathing in place of wood. Id. Plaintiff opted not to pay for these additional qualities when it constructed the building, and cannot force defendant to pay for them now.[7]

Therefore, recoverable damages must be calculated using the cost of a new FRT wood truss system. This is the only measure of damages that is consistent with South Carolina law, which allows recovery only for the cost of restoring the property to its pre-

---

[7] The fact that FRT lumber was weaker than untreated wood was known and disclosed prior to 1972, when the Administration building was built. (See Tr. at 61, 479.) However, there is no evidence that plaintiff knew of these conditions when it constructed the Administration building.

injury condition.  See Sea Side Villas, 64 Fed. App. 367.  Plaintiff contends in response

that it does not want to use FRT wood because it has certain disadvantages when

compared to steel.  This argument reflects the fact that steel is an upgrade over plaintiff's

current system.  Because the steel cost represents an unrecoverable betterment, any

measure of damages is limited to the lower FRT wood cost.

At the trial on damages plaintiff introduced evidence that the cost of materials to

replace the current trusses and sheathing with steel would be as much as $204,946.78 at

current prices.  The cost of materials for replacing the current system with a new FRT

wood system is substantially less due to different materials and construction

requirements.  Line items 3.01 and 3.02 (buildings materials) may be reduced by 15% to

reflect the lower cost of wood.[8]  Line item 3.04 ("firring strips") can be taken out. (Tr. at

272.)  Either line item 3.03 (metal roof sheathing) or 3.05 (sheathing) can be removed.

(Tr. at 272.)  Since line item 3.03 is more expensive, 3.05 will remain.  These changes

reduce the replacement cost (line items 3.01 - 3.05) by $85,962.48 to $118,984.30.[9]

### d.    Cost Estimate

Defendant advances a number of objections to plaintiff's January 2005 cost

estimate.  This order has already addressed several of these objections.[10]   Defendant

---

[8] The general contractor who developed the January 2005 cost estimate stated these items could be reduced by 15-20%.  (Tr. at 272.)

[9] Defendant's expert reaches a lower number by citing different material quotes than those used by plaintiff's contractor.  For the reasons discussed below, the court will use the plaintiff's cost estimate.

[10] Defendant maintains the cost estimate should be altered to reflect a wood, not steel, replacement roof.  The court agrees.  See supra, p. 20.  Defendant argues the expense for temporary classroom and office space should be eliminated.  The court

contests the overall cost estimate prepared by plaintiff's contractor on the basis that it was not prepared with competitive bids. (Tr. at 268.) Defendant proffers the qualified opinion of another licensed professional engineer and registered roof consultant who believes the January 2005 estimate could be reduced in specific areas. (Moore Decl.) This critique properly suggests the elimination of $3,753.00 for "bottom edge flashing" (line item 3.09), which is apparently not necessary in a wood roofing system. (Moore Decl. ¶ 8.) However, most of defendant's objections argue the specific materials could cost less and/or tasks could be completed in less time or at less expense. In this clash of proposals, the court finds plaintiff's estimate more reliable. Plaintiff' cost estimate is an actual bid prepared by a general contractor who concentrates primarily on restoration projects and has worked on nine FRT repair-related projects. (Tr. at 219-20.) On all nine FRT projects, the task involved a complete roof removal and replacement. (Tr. at 221.) Cost estimates for this project were based on "experience that we are having as we're doing, currently . . . these FRT projects." (Tr. at 235.) The electrical and plumbing allowances are specifically calculated based on previous experiences. (Tr. at 240.) The percentage fees (contingency allowance, bonding and licenses, design fees and construction administration, overhead and profit) are customary, standard and/or normal. (Tr. at 254.) Another of plaintiff's experts, a licensed professional engineer and registered roof consultant with experience in preparing construction cost estimates, validates the January 2005 statement as accurate. (Campbell Decl. ¶ 3.) In contrast, defendant's expert has limited experience with FRT structures. (Tr. at 386-87.)

---

disagrees. See supra, p. 18.

23

Defendant's expert's calculations are not an actual bid but are based on an engineering opinion. For these reasons, the court adopts the plaintiff's cost estimates for the line items specifically challenged by defendant, with the exception of line item 3.09 and the allowances for a steel replacement system.[11]

### e.      Attorneys' Fees and Other Costs

Plaintiff requests attorneys' fees as well as compensation for Dr. Lee's testing services ($1,600), Alan Campbell's engineering services ($11,726) and the preparation of the cost estimate ($1,050). (Pl.'s Proposed Order at 26; Tr. at 33, 258, 131; Pl.'s Ex. 3, 9, 12.) All of these costs are supported by invoices, except a $6,500.00 portion of Campbell's expenses. (Tr. at 132; Pl.'s Ex. 9.) SCUTPA expressly permits the award of reasonable attorneys' fees and costs. See S.C. Code Ann. 39-5-140(a) (1976). Plaintiff's request for attorneys fees is granted, with an amount to be determined upon receipt of counsel's affidavit and any response thereto.

The SCUTPA also permits recovery of actual damages. Actual damages "under SCUTPA include special or consequential damages that are a natural and proximate result of the deceptive conduct." Global Protection Corp. v. Halbersberg, 332 S.C. 149, 159, 503 S.E.2d 483, 488 (Ct. App. 1998). Preparing a cost estimate for repairs falls into this category; therefore, the $1,050 incurred preparing the cost estimate is recoverable as

_____

[11] Defendant challenges line item 2.02 (protection of building components); line item 2.05-2.07 (removal of truss roof system, dumpster and load debris costs); line item 3.11 (replacement of soffit and fascia); line item 5.01 (electrical allowance); line item 7.01 (plumbing allowance); line item 8.01 (general condition allowance), and the contingency allowance, bonding and licenses, design fees and construction administration, overhead and profit percentages. (Moore Decl. ¶¶ 5-14.)

damages.

Campbell's $15,678.20 invoice includes services rendered for all three campus buildings; plaintiff attributes a third ($5,226.07) to the Administration building. According to Campbell, the actions detailed in the invoice were carried out at the same time for all three buildings. (Tr. at 131.)  The invoice includes inspection, investigation, and/or evaluation of the truss system.  These expenses are actual damages that proximately result from the truss system's condition.  A $619.50 portion of the invoice represents expenses for correspondence with plaintiff's previous attorney, and is not recoverable.  A third of those expenses ($206.50) is attributable to the administration building.  Therefore, plaintiff may recover $5,019.57 of Campbell's expenses.

Plaintiff also seeks to recover the $1,600 cost of wood testing performed by plaintiff's expert Andy W.C. Lee.  This cost is not a natural result of the wood's condition, but rather was prepared in anticipation of litigation.  As such, it cannot be recovered under SCUTPA.

### f.     Reduction for Previous Satisfactory Service

#### i.     Satisfactory Service

Defendant contends any award should be reduced to account for plaintiff's years of satisfactory use of the FRT lumber.  Plaintiff does not allege any problems with the FRT lumber before the premature deterioration was discovered "just prior" to January 2002.  (Pl.'s Amended Compl.¶ 12.)  As such, the court finds plaintiff had thirty years of satisfactory service in the FRT product.

Defendant contends South Carolina law mandates such a setoff.  See Campus

25

Sweater & Sportswear Co. v. M.B. Kahn Constr. Co., 515 F. Supp. 64, 103 (D.S.C. 1979)

aff'd, 644 F.2d 877 (4th Cir. 1981).   In Campus Sweater, the plaintiff sought cost-of-

replacement damages for defective roof shingles.  Although the roof  "could reasonably

be expected to last 20 years," the shingles failed and began to leak after approximately

five years.  Id. at 103.  Because the plaintiff "received the benefits" of the roof for

"approximately 25 per cent [sic] of its useful life" the court reduced the plaintiff's

damages claim by the same twenty-five percent.  Id.

Other jurisdictions apply the same rule under the rubric of the "new for old"

doctrine.  Under the new for old doctrine:

> A party suffering injury is entitled to recover only that which is necessary
> to restore his damaged property to the same condition as existed
> immediately prior to the [injury].  This rule is designed to avoid giving the
> injured person a windfall by furnishing something entirely new for that
> which was old and depreciated and would in the normal course of things
> have to be replaced in any event.

Tidewater Marine, Inc. v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 1008 (E.D. La. 2000)

(citations and quotations omitted).  For example, in Midwest Indus. Painting of Fla., Inc.

v. United States, 4 Cl. Ct. 124, 134-35 (Cl. Ct. 1983), the United States withheld payment

on a contract, in part because it alleged the contractor had damaged certain seals during

sandblasting.  Although the seals were still operational at the time they were damaged,

they had already been in service for twenty-eight years - forty percent longer than the

expected service life - and were slated to be replaced within two years.  Id. at 135.  The

court held that allowing the United States to withhold the cost of replacing the seals

under such circumstances would constitute a windfall and was prohibited by the "new for

old" rule.  Id.; see also Bunge Corp. v. American Commercial Barge Line Co., 630 F.2d

1236, 1242 (7th Cir. 1980) (damages for equipment damaged in collision with barge were cost of replacement less sixty percent because only forty percent of useful life remained).

Plaintiff distinguishes <u>Campus Sweater</u> from the case at bar on the basis that roof trusses, unlike shingles, have an indefinite life.  But for defendant's defective product, plaintiff would not have had to replace the wood trusses during the building's normal service life.  Plaintiff suggests depreciation is not warranted for products with an indefinite service life, and that the truss is such a product.  <u>See, e.g.</u>, <u>In re M/V Elaine Jones v. Griffith</u>, 480 F.2d 11, 27 (5th Cir. 1973) (no depreciation for 100 year old bridge which court held to have indefinite life expectancy).

FRT lumber lies somewhere between the transience of roof shingles and water seals and the permanence of bridges.  Yet the policy behind the "new for old" doctrine applies to this case.  If the court did not recognize the previous satisfactory service, plaintiff would receive a new product in place of a thirty year old one.  Plaintiff would be placed in a position superior to that which existed before the injury; i.e., plaintiff would have thirty years of worry-free service plus the life expectancy of a brand new truss system.

## ii.    Life Expectancy

To apply the thirty year setoff, the court must ascertain the life expectancy of a FRT truss system.  Defendant's wood science and technology expert (Frank Bealle) proffered a survey of architects, engineers, builders and developers regarding their expectations of the serviceability life of different types of buildings.  (Tr. at 499.)  The survey was presented by Forintek, a Canadian entity similar to the USDA Forest Products

27

Laboratory, at a 2004 conference which the expert attended. (Tr. at 486.)  The survey was "carried out" by the Athena Institute, which the expert states has a good reputation for reliability and statistical analysis.  (Tr. 492, 496.)  The survey queried 683 professionals on their expectation of the serviceability life of buildings based on primary building material, including masonry, steel, and wood. (Tr. at 489.)  Prior to presentation at the conference, the survey was reviewed by Forintek and Athena officials with the same rigor given to papers prior to publication. (Tr. at 496.)  The survey's results suggested untreated wood buildings have a life expectancy of 51.6 years. (Tr. at 502.)  Plaintiff's counsel objected to admissibility on the grounds defendant failed to establish a scientific basis for the survey.[12]

Relevancy and reliability are the two touchstones for admissibility of expert testimony. U.S. v. Crisp, 324 F.3d 261. 268 (4th Cir. 2003) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)).  This survey is lacking in both regards.  The survey does not address the life expectancy of the building material at issue, FRT lumber.  Moreover, the record lacks any qualified discussion of the survey's reliability.  In considering the reliability of survey results, the design, administration, and interpretation of the survey should be considered. See Menasha Corp. v. News America

---

[12] The survey is also inadmissible hearsay, although plaintiff's counsel did not raise the issue.  The survey is an out of court statement offered to show the truth of the matter asserted therein.  The hearsay exception for learned treatises does not apply because the survey was not established as a "reliable authority" by the witness proffering its use. See Fed. R. Evid. 803(18); Costantino v. Herzog, 203 F.3d 164, 172 (2nd Cir. 2000) (noting 803(18) requires trial judges to determine whether proffered evidence is trustworthy as viewed by professionals in the relevant field).  As noted, defendant also provided no evidence of the survey's scientific reliability.

Marketing In-Store, Inc., 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003) (holding survey results inadmissible under Daubert because surveyor failed to observe "standard protocols of survey research"); see also U.S. v. Local 560 of International Brotherhood of Teamsters, 780 F.2d 267, 277 (3rd Cir. 1985) (survey inadmissable because of failure to "comport with accepted survey techniques" and "accepted standards of sampling"). In the case at bar, defendant did not present any testimony regarding the survey's design, administration, or interpretation. Beale's opinions on these topics are of limited value since he is a wood scientist, not an expert in conducting surveys. Nor was he involved in the survey's design, administration or interpretation. Since defendant has the burden and has not satisfied the court that the survey meets Daubert's reliability standards, the survey results are unreliable, therefore inadmissible, and cannot be used to estimate a FRT truss system's life expectancy.

The testimony of plaintiff's experts as to the life expectancy of FRT lumber is similarly lacking. Neither of plaintiff's experts who testified on the issue discussed FRT wood, but instead estimated the serviceability life of untreated wood. Plaintiff's experts estimated the life expectancy of untreated wood at "several hundred years," (Tr. at 38) and "two to three hundred years," (Tr. at 130). Both estimates are so vague as to be of little use. Neither expert stated how he arrived at his estimate. Since the experts did not share their thinking with the court, there is no way of knowing if these estimates are anything else but complete wild guesses. As such, neither of plaintiff's estimates are reliable nor admissible.

Defendant alternatively contends that plaintiff's building has an expected service

life of zero.  Defendant's structural engineering expert testified that the truss system was poorly designed, and thus had no remaining service life on day one. (Tr. at 345-46.)  This "dead on arrival" argument reasons that the trusses needed replacement from the start, and exceeded expectations by lasting thirty years.  Defendant's contention is belied by the plain fact that the structure lasted thirty years, withstood Hurricane Hugo, and did so on weaker than normal wood.  With these facts, the court cannot reasonably conclude that the structure had a life expectancy of zero.

Defendant also contends that damages should be limited because plaintiff's FRT structure has lasted longer than other FRT systems of its era.  Several of the transcript portions cited by defendant for this proposition discuss the longevity of the Firex brand in general, but not the structure at issue. (Tr. at 484, 507.)  The one sentence cited by defendant that supports this contention provides anecdotal evidence that plaintiff's building has lasted longer than other FRT buildings examined by plaintiff's engineering expert. (Tr. at 14-150.)  From this statement the court cannot reasonably conclude plaintiff's truss system has outlasted its life expectancy.

### iii.    Application of setoff

While the court recognizes the requirement of reducing the award in light of the thirty years of service, it is without any reliable estimate of an FRT truss system's service life.  As such, there is no way of determining what percentage of the product's service life the thirty years represents.  The court faces two options: either make its own estimate or not reduce the award.  The first option is arbitrary and unacceptable, since the court has no basis to make its own estimate, so the latter is the only viable option.  The equities

support this decision; defendant advances the reduction argument, yet fails to present sufficient evidence to support its application. Generally speaking, the party whose wrongful act caused the damage carries the burden to prove anything that might lessen the damages. See R.P. Davis, Presumption and Burden of Proof Regarding Mitigating of Damages, 134 A.L.R. 242 (updated 2005). Although satisfactory service credit and mitigation of damages are distinct concepts, the underlying policy is instructive. The at-fault party should not benefit from its own failure to lay a foundation for the reduction of damages; conversely, the injured party should not carry the burden of proving that which would reduce its own damages. As between the parties, defendant is better suited to shoulder the consequences of the failure to provide a credible life expectancy. As such, the award will not be reduced to reflect the thirty years of service.

**V.**     **CONCLUSION**

In summary:

a.     Plaintiff's negligence action is barred by the economic loss rule.

b.     The factual allegations of the default complaint support finding liability under SCUTPA.

c.     Damages are to be based on plaintiff's January 25, 2005 cost estimate as revised at trial. This amount may include the costs for temporary classrooms and office space, and the increased cost of materials since November 2002. However, if the earliest opportunity for the repair falls during the summer, plaintiff may not recover the costs for temporary classroom and office space, and associated expenses.

31

d.     Damages must be based on the cost of providing a new FRT wood truss system, not a steel replacement. The January 25, 2005 cost estimate must be reduced accordingly.

e.     Damages can not be reduced to account for previous satisfactory service.

f.     Plaintiff may recover $6,276.07 in costs.  Plaintiff's request for attorneys fees is granted, with an amount to be determined upon receipt of counsel's affidavit to be submitted within fifteen days of the date of this order and any response thereto.

For the reasons stated above, it is therefore **ORDERED** that plaintiff is entitled to an award of $871,690.15.  Alternatively, if plaintiff's general contractor determines that the earliest date for replacement falls during the summer, plaintiff cannot recover the costs of temporary classrooms and other associated expenses, and is entitled to an award

of $690,158.62.[13]

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

September 6, 2005
Charleston, South Carolina

--------

[13] The alternative damage awards are detailed as follows:

| Award with temporary classrooms and associated expenses | Award without temporary classrooms and associated expenses | |
|---|---|---|
| $735,026.78 | $735,026.78 | January 25, 2005 cost estimate subtotal with trial revisions.  See supra, n.3 |
| - $85,962.48 | - $85,962.48 | Difference between wood and steel replacement |
| - $3,753.00 | - $3,753.00 | Bottom edge flashing allowance |
| N/A | - $135,329.90 | Temporary classrooms and associated expenses, decreased by storage allowance. See supra, n. 6. |
| $645,311.3 | $509,981.40 | Subtotal |
| $220,309.28 | $174,107.65 | 34.14% markup |
| $865,620.58 | $684,089.05 | Replacement total |
| $6069.57 | $6069.57 | Addition of costs |
| $871,690.15 | $690,158.62 | **Total damages** |

33